610

Equitable Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. City of Pittsburgh et al., Intervenors.

United States Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. City of Pittsburgh et al., Intervenors.

Jones & Laughlin Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. City of Pittsburgh et al., Intervenors.

Argued February 7, 1979, before President Judge Bowman and Judges Crumlish, Jr., Mencer, Blatt, DiSalle, Craig and MacPhail. Judges Wilkinson, Jr. and Rogers did not participate.

*Charles E. Thomas, Jr.,* with him *Augustine A. Mazzei, Jr., Patricia Armstrong,* and, of counsel, *Thomas & Thomas,* for Equitable Gas Co.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff; Wick, Vuono & Lavelle;* and, of counsel, *Kenneth R. Pepperney* and *Maurice A. Frater,* for United States Steel Corporation and Jones & Laughlin Steel Corporation.

*Joseph J. Malatesta, Jr.,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Kathleen Herzog Larkin,* Chief Counsel, for Pennsylvania Public Utility Co.

*Marvin A. Fein,* Utilities Counsel, with him *Mead J. Mulvihill, Jr.,* City Solicitor, for City of Pittsburgh and Mayor Richard S. Caliguiri.

OPINION BY JUDGE MACPHAIL, September 12, 1979:

On March 31, 1976, Equitable Gas Company (Equitable) filed with the Pennsylvania Public Utility Commission (PUC) Supplements Nos. 83 and 84 to its Tariff, Gas-Pa. P.U.C. No. 18 seeking a total increase in additional annual revenues of $19,499,927 and proposing changes in existing rates.[1] After numerous hearings and deliberations, the PUC on June 28, 1977, adopted a final order at R.I.D. 317 which was entered September 13, 1977, disallowing $8,192,092 of Supplement No. 84, but permitting Equitable to provide additional revenue above Supplement No. 83 of $2,750,-000, and imposing a rate structure substantially different from that proposed by Equitable.

The vote on the order was not unanimous. Commissioner Bloom wrote a vigorous dissent. Commissioner O'Bannon filed a concurring opinion. The record is voluminous and the detailed PUC order itself is 35 pages in length.

In No. 1981 C.D. 1977 Equitable contends that the PUC erred: (1) in its fair value finding of $233,200,000 as opposed to Equitable's claim of $296,902,807; (2) in its finding of a fair rate of return of 8.28% to 8.46% as compared with Equitable's claim of 10%; and (3) in its determination of Equitable's operating revenues, expenses and taxes. Equitable has also alleged that the PUC's disallowance of $8,192,092 of Supplement No. 84 is a confiscation of Equitable's property. We need not address that issue in this opinion because we find it necessary to remand the case to the PUC for further consideration which may result in a revision of the final order and may also thereby eliminate the charge of confiscation. In Nos.

---

[1] Supplement No. 83 seeks $8,557,835 and Supplement No. 84 seeks $10,942.092. On February 25, 1977, Supplement No. 83 was established as a temporary rate, effective March 2, 1977, until final order of the PUC.

2008 and 2009 C.D. 1977, United States Steel Corporation and Jones & Laughlin Steel Corporation contend that the PUC's imposition of new rate blocks and concomitant rate increases: (1) results in rates which are not supported by the record; (2) violates the Public Utility Code; (3) was unreasonable, arbitrary and discriminatory; and (4) was a capricious exercise of the PUC's statutory authority.

Equitable is engaged in the production, purchase, storage, transmission, distribution and sale of natural gas and serves customers in Pennsylvania, West Virginia and Kentucky. At the end of the test year, December 31, 1975, Equitable was serving a total of 239,855 customers of which 222,594 residential, 16,897 commercial and 364 industrial customers were located in the Pennsylvania service area.

### Fair Value[2]

Equitable maintains that the PUC erred in its determination of fair value in the instant case by disallowing Equitable's item of minimum bank balances, by using the market value of Equitable's securities as a measure of fair value and by failing to give proper weight to Equitable's trended original cost measure of value.

Equitable claims an item of $4,871,900 for minimum bank balances that it contends that it is required by its depository banks to maintain in order to obtain a loan commitment which in turn assures an ade-

---

[2] The City of Pittsburgh and Mayor Richard Caliguiri have filed an intervenor's brief in which they urge us to reject the "fair value/fair rate of return" rule and affirm the PUC's order if the return allowed is "just and reasonable." While that approach has much to commend it, we are bound by our Supreme Court's rejection of a similar argument in *Keystone Water Company, White Deer District v. Pennsylvania Public Utility Commission*, 477 Pa. 594, 385 A.2d 946 (1978).

quate cash source to finance its inventory of gas and to carry out its ongoing construction program. The PUC denied this item on the basis that Equitable failed to prove that it maintained such a balance on an average daily basis and that it failed to show that such a requirement was either adhered to or enforced by the banks.

As part of its case Equitable introduced into evidence a letter from each of its depository banks. The Mellon Bank indicated that Equitable was required to maintain compensating balances during the year 1975 in a sum approximating $4,250,000. The letter from Equibank states categorically that in 1975 Equitable did maintain an average daily balance in its account of $185,014 as a compensating balance and that more would likely be required in the future. Equitable also presented the prepared testimony of George D. Porter, who was not cross-examined, and who, when asked about the compensating balances maintained by Equitable in 1975, answered:

> As shown on Sheet 6 of Exhibit 12B, I have shown the actual compensating bank balances as required by the banks, which amounted to $4,387,300. This is comprised of $3,485,600 as calculated and applicable to borrowings under line of credit agreements, and $901, 700 applicable to requirements for activity charges. *As further proof that such compensating bank balances are not only required by the banks but are actually maintained by Equitable,* I have shown on this same sheet the average daily bank balances *actually incurred* by Equitable for the calendar year 1975 which amounted to $4,092,014. (Emphasis added.)

There is nothing in the record to impeach or contradict this evidence. The concurring opinion (Commissioner O'Bannon) expresses concern about and the

dissenting opinion (Commissioner Bloom) expresses outright disagreement with the majority's treatment of this item. Indeed, according to Commissioner Bloom's dissenting opinion, the PUC staff report to the PUC provided for the allowance of a substantial amount of the minimum bank balances claimed by Equitable.

In its argument to us the PUC contends that it was Equitable's burden to prove the amount they claimed as an average daily balance and that the various figures in the record failed to prove that specific amount. While there is no doubt that the utility does bear the burden of providing evidence to support the increase it seeks, we must agree with Equitable that to disallow such a substantial item in its entirety was arbitrary and an abuse of discretion in view of the substantial evidence in the record which would support most, if not all, of the amount claimed by Equitable in this respect.

We conclude that the PUC erred as a matter of law in holding that Equitable had not met its burden of proof with respect to this item.

In arriving at fair value, the PUC has employed a "simple formula" arrived at by averaging the original cost, the trended original cost and an amount equivalent to the "best estimate" of the PUC of the value of Equitable's rate base as determined by the market value of Equitable's stocks and bonds. Equitable complains that the market value of its stocks and bonds is in no way related in this case to the value of its property devoted to public service.[3] Furthermore, Equitable complains that there was absolutely no evidence in the record from which the PUC

_____

[3] The PUC found the original cost to be $195,600,000, the trended original cost $354,000,000 and the securities market value $150,000,000.

could determine the market value of Equitable's securities.[4]

It is true that the determination of the fair value figure is largely in the discretion of the PUC provided that the PUC considers all relevant factors and elements which bear upon fair value and provided further that its action is within the area of its administrative discretion and is supported by the evidence. *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.,* 19 Pa. Commonwealth Ct. 214, 341 A.2d 239 (1975). The PUC did not err by considering the market value of Equitable's securities, *Philadelphia v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 641, 102 A.2d 428 (1954), but there is nothing in the record from which a determination of that value could have been made. In the instant case, the PUC's counsel attempted during the course of the hearing to introduce all standard financial publications and standard financial market services by reference. Counsel for Equitable timely objected on the grounds that Equitable wished to know "what publications are being incorporated by reference" in order that Equitable's counsel could say "yes or no" at the time reference to a specific publication or manual was made. In view of the fact that there was no subsequent reference to any market service report or financial publication, we must hold that the PUC erred as a matter of law by determining the value of Equitable's securities from evidence outside the record. *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio,* 301 U.S. 292 (1937).

---

[4] The PUC used Moody's Public Utility Manual for 1976 to determine market values for the securities for the test year and then applied a discount factor.

Although Equitable argues with considerable force that the PUC failed to give proper weight to trended original cost and original cost, we hold that the weighing done by the PUC in the instant case was within its administrative discretion.

## FAIR RATE OF RETURN

A public utility is entitled to a fair return based upon the fair value of its property used and useful in the public service. *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa. Commonwealth Ct. 135, 317 A.2d 917 (1974). Our case law is to the effect that in determining fair rate of return, the PUC may give consideration to a number of factors including the "cost of capital." "Cost of capital" is a percentage figure representing the cost that a public utility would be obliged to pay to obtain debt and equity capital. In its determination of cost of capital, the PUC is obliged to give consideration to many factors including the utility's financial structure, credit standing, dividends, interest, risks, regulatory lag, wasting assets and any peculiar features of the utility involved. Because of these many factors, the cost of capital is basically a matter of judgment which should be left to the regulatory agency and which should not be disturbed except for a manifest abuse of discretion. *Lower Paxton Township v. Pennsylvania Public Utility Commission, supra.*

Equitable claims that the PUC abused its discretion when it changed Equitable's capital structure figures by increasing long-term debt from 53 to 55 percent without any increase in the embedded cost of debt and by determining that Equitable's cost of equity capital was 9.63 to 10.06 percent. By making these changes in Equitable's capital structure, the PUC determined the fair rate of return to which Equitable was entitled to be 8.28 to 8.46 percent on

fair value. Equitable claimed a fair rate of return of 10.0 percent.[5]

Although the PUC opinion does set forth a myriad of figures which compares Equitable's capital structure with that of seven other utilities, the opinion does not show the precise mathematical calculations nor the reasoning by which the PUC translated those figures into a cost of capital of 9.63 to 10.06 percent. The failure of the PUC to do this leaves us in the position where we simply cannot tell as a matter of law whether the PUC abused its discretion or not. The PUC brief goes to great length to explain how these precise figures were arrived at and even explained how the PUC "reasoned." While counsel may indeed be in a position to determine how the PUC made its calculations and how it reasoned, such explanations cannot be accepted by this Court unless there is some basis for them in the PUC opinion itself.

Therefore, on remand we will require the PUC to set forth in its opinion the precise mathematical calculations used to determine Equitable's cost of capital as well as its reasoning in support of such calculations.

### Determination of Operating Revenues, Expenses and Taxes

Equitable challenges the determination by the PUC that "in a normal year, Equitable could sell between 78,000,000 MCF to 79,600,000 MCF of gas." There is nothing in its order to explain how the PUC ar-

---

[5] Although the PUC claims that due to an adjustment in long term debt, Equitable had adjusted its claimed fair rate of return to 9.78%, we find nothing in the record or in Equitable's brief to substantiate such a finding. In any event the difference between the rate of return as found by the PUC and either of the rates claimed by Equitable is so gross as to warrant a remand.

rived at this determination. The record shows that in the test year, Equitable actually sold 73,850,728 MCF. In the test year, however, Equitable was compelled to reduce industrial sales because of the effect of a tropical storm which curtailed the supply of natural gas. Recognizing this fact, Equitable estimated increased sales of 1,850,000 MCF to industrial users in a "normal year." At the same time, Equitable also produced testimony to indicate that the short supply of gas was not a one time problem but a continuing problem for the foreseeable future.

There can be no doubt that the PUC has the authority, if not the duty, to make necessary adjustments in a utility's estimated sales where the test year year is atypical. *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 144 A.2d 648 (1958). In its argument to us, the PUC contends that even though there may not be substantial evidence to support its determination of some 3 to 4 million additional MCF of gas in a normal year, the net result has not been harmful to Equitable. We hold that in view of the complicated nature of all rate making proceedings, where the PUC makes a determination which affects a mathematical component of the basis upon which an increase in rates will be granted or denied and which is not based upon substantial evidence, we cannot conclude as a matter of law that the utility has not been prejudiced by the error.

Equitable likewise challenges the PUC's determination that the test year had an unusual heating period. The PUC determination was based upon National Weather Service data. Again, however, there is absolutely nothing in the record concerning that data. Consequently, there is no substantial evidence to support the PUC finding. Again, this is manifest error.

620

As a result of its determinations that Equitable could sell more gas, the PUC determined that Equitable's normalized sales revenues should be increased by over $5,000,000 in a normal year over the test year. Since we have found that the PUC erred in its initial determinations, we agree with Equitable that the results which follow must be set aside.

Finally, Equitable takes exception to that part of the PUC order which adjusts the federal and state income tax figure used by Equitable in support of its tariff applications. Specifically, Equitable calls to our attention that the PUC order states that the adjustment for taxes "includes an adjustment for taxes due to revisions in the capital structure." Equitable contends that it is necessary for the PUC to spell out what adjustments it has made to the revisions in its capital structure. While we would not remand for this cause alone, in view of our rulings on other matters presented in this appeal which do necessitate a remand, we will direct the PUC to set forth in its subsequent order the precise nature of adjustments it has made to taxes due to revisions it made in Equitable's capital structure.

## RATE STRUCTURE

The PUC's order directs the filing of a rate structure not proposed by Equitable but imposed by the PUC without evidentiary foundation. This new rate block structure established by the PUC is not supported by any findings of fact or conclusions of law. Therefore, this furnishes an additional reason to remand.

## CONCLUSION

Since we have found errors in the PUC order which may affect that part of its order which disallows $8,192,092 of the tariffs filed by Equitable, it is necessary for us to remand the proceeding to the

PUC for a redetermination of whether the complaints filed to the proposed increase should be sustained and, if so, to what extent, and for the making of necessary findings of fact and conclusions of law regarding the rate structure to be approved.

Judge DiSalle concurs in result only.

ORDER

AND Now, this 12th day of September, 1979, the final order of the Pennsylvania Public Utility Commission dated June 28, 1977 disallowing $8,192,092 of the proposed annual increase sought by Equitable Gas Company is set aside. The record is remanded to the Commission for proper findings on fair value, fair rate of return, operating revenues, taxes and rate structure in conformity with our opinion herein on those matters. The Commission may receive such additional evidence as the circumstances require and upon making proper findings, the Commission shall revise and modify its final order to the extent necessary in light of such findings.