The Peoples Natural Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent; City of Pittsburgh et al., Intervenors.

United States Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent; The Peoples Natural Gas Company et al., Intervenors.

Allegheny Ludlum Industries, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent; The Peoples Natural Gas Company et al., Intervenors.

514

Argued February 7, 1979, before President Judge BOWMAN and Judges CRUMLISH, JR., MENCER, BLATT, DISALLE, CRAIG and MACPHAIL, Judges WILKINSON, JR. and ROGERS did not participate.

*Robert H. Young,* with him *Walter R. Hall, II, Nancy M. Sproull,* and, of counsel, *John J. Mullally, Roger E. Wright,* and *Morgan, Lewis & Bockius,* for The Peoples Natural Gas Company.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff,* and, of counsel, *J. F. Wilson,* and *Wick, Vuono & Lavelle,* for United States Steel Corporation.

*Carl E. Rothenberger, Jr.,* with him *Stephen A. George, Samuel W. Braver,* and *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for Allegheny Ludlum Industries, Inc.

*Frank B. Wilmarth,* Assistant Counsel, with him *George M. Kashi,* Acting Chief Counsel, for Pennsylvania Public Utility Commission.

OPINION BY JUDGE CRAIG, December 5, 1979:

The Peoples Natural Gas Company (Peoples) has petitioned this court for a review of the final order of the Pennsylvania Public Utility Commission (PUC) entered January 13, 1978, disallowing approximately 12.5 million dollars of a requested 14.7 million dollar increase in Peoples' revenue from natural gas service.

These proceedings began when, on January 29, 1976, Peoples filed Tariff Gas-Pa. PUC No. 37 and Supplement No. 1 seeking increases in rates to become effective March 30, 1976. On March 23, 1976 the PUC suspended both tariffs until September 30, 1976, the initial six-month period provided by Section 308 of the Public Utility Law,[1] 66 P.S. §1148(b), and also instituted a proceeding at its Rate Investigation Docket (R.I.D.) 308 to determine the reasonableness of the proposed rates.

On September 29, 1976, on petition of Peoples, the PUC allowed Tariff No. 37 to become effective, while continuing its suspension of Supplement No. 1 for an additional 3 months. On December 29, 1976 the PUC issued an order fixing temporary rates, embodying a rate increase of approximately 6.35 million dollars.

On February 23, 1977 the PUC staff served a proposed order approving an increase of 7.34 million dollars in Peoples' service rates. After receiving briefs and oral argument, the PUC, on July 25, 1977, voted 3-to-1 to allow Peoples additional revenues of 2.22 million dollars, over 4 million dollars less than the rates in effect under the 1976 temporary rate order. The

---

[1] Act of May 28, 1937, P.L. 1053, repealed by Section 2 of the Act of July 1, 1978, P.L. 598. A similar provision is now found at Section 1 of the Public Utility Code, 66 Pa. C.S. §1308(b).

PUC entered its written final order on January 13, 1978.

On January 23, 1978 Peoples filed in this court its petition for review. The PUC adopted an order of February 1, 1978 continuing the temporary rates until final decision by this court.

The United States Steel Corporation (USS), at No. 230 C.D. 1978, and Allegheny Ludlum Industries, Inc. (Allegheny) at No. 235 C.D. 1978, filed petitions for review of the rate structure aspects of the January 13, 1978 commission order. Peoples intervened in bóth those proceedings; they have been consolidated with Peoples' petition for review of the commission's order, with which we must first be concerned.

## 1. FAIR VALUE

Peoples submitted that the fair value of its gas plant at December 31, 1975, the end of the 1975 test year, should be found to be 292 million dollars. The PUC concluded that the fair value should be set at 265 million dollars, the same as the fair value allowed Peoples in R.I.D. 205, the last preceding Peoples rate proceeding. Peoples has posed issues as to several adjustments made by the PUC with respect to depreciated original cost and has also questioned the fair value conclusion reached by the PUC in relating adjusted original cost and trended original cost.

The questioned adjustments to original cost involve disallowance of part of the claimed total of minimum required bank balances, refusal to include in rate base a capitalization of employee benefit costs associated with 1974 plant construction, and deduction of part of a 1971 income tax refund from the original cost measure. Before examining the fair value conclusion, we will treat each of these adjustments in turn.

### a. Original Cost Adjustment: Minimum Bank Balances

As an element of rate base, Peoples claimed a minimum bank balance total of 2.9 million dollars in this proceeding, the same amount which had been allowed by the commission in R.I.D. 205. The PUC, however, here disallowed $400,000 and approved only 2.5 million dollars for that element.

Peoples submitted in evidence letters from its three major banks setting forth requirements which, in terms of the absolute minimum amounts set forth, totaled 2.8 million dollars. Peoples also submitted evidence of an average daily balance over the 1975 test year of $2,440,600 in those three banks. In addition, Peoples presented evidence of additional balances in other banks so that the average daily balance in all banks was $3,112,200.

Peoples does not dispute the principle that bank balances are to be included in the rate base only to the extent that they represent requirements of the banking institutions. Peoples has not pointed to any evidence of banking requirements other than the letters from the three major banks, and we believe that the PUC was correct in concluding that the actual test year experience showed that those three institutions were actually requiring aggregate balances slightly under 2.5 million dollars, instead of the 2.8 million dollars set forth in the letters or the 2.9 million dollars claimed. The mere existence of continuing balances in other banks, without evidence that such balances were required, do not satisfy Peoples' burden to identify them as minimum amounts.

We therefore conclude that the PUC was correct in disallowing $400,000 as to minimum bank balances. The evidence here is distinguishable from the uncontradicted testimony as to balance requirements which

we held to be sufficient in *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 45 Pa. Commonwealth Ct. 610, 405 A.2d 1055 (1979). Moreover, the fact that the PUC allowed the full 2.9 million claimed in R.I.D. 205 for the test year 1974 does not in any way prevent the PUC from reexamining the evidence presented as to the test year 1975 in the present proceeding.

b. Original Cost Adjustment: Employee Benefit Costs

In the previous proceeding at R.I.D. 205, the PUC ordered that employee benefit costs associated with 1974 plant construction should be disallowed as current operating expense, but capitalized as a rate base element; thus such costs in the amount of $1,275,070, accrued in 1974, were added by the PUC to the rate base in that case.

With respect to employee benefit costs of $1,084,-909 related to 1975 construction, which Peoples again sought to apply to operating expenses, the PUC again found that costs of that sort should be disallowed as operating expenses and capitalized as an addition to rate base.

However, the commission refused to include in the rate base for this proceeding the same $1,275,070 which the PUC had capitalized in R.I.D. 205. The PUC here excluded the latter amount on the ground that Peoples, despite its awareness of the order in R.I.D. 205, had failed to accept that conclusion and persisted in presenting the 1974 figure as operating expense instead of part of rate base. PUC counsel characterizes Peoples' position as a continued collateral attack on the R.I.D. 205 order and, in effect, suggests that Peoples should not be allowed the amount as rate base element because it has not expressly requested it to be so considered.

We must characterize this approach of the PUC as somewhat illogical and perhaps slightly punitive in tone. If the PUC itself deems that employee benefit costs associated with 1974 construction should be capitalized as part of the rate base, then, absent a successful challenge of that position by the utility, that amount is properly part of the rate base and should be so treated, consistently with the PUC's treatment of the like 1975 amount.

c.   Original Cost Adjustment: 1971 Income Tax Refund

In both R.I.D. 205 and this proceeding, the PUC has required that a federal income tax refund received in 1974 with respect to 1971 income taxes, in the amount of $1,948,430, be flowed through to ratepayers by amortizing it over a ten-year period against income, with the unamortized portion as of 1975, $1,558.774, being excluded from the original cost measure of value.

Peoples argues that, because it would not be permitted to recover from customers any additional income tax which might now be levied for 1971, it is likewise improper to require the benefit of a tax refund to be given to the ratepayers, without evidence of excessive revenues having been received by Peoples in the tax year involved. Peoples cites *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. 328, 311 A.2d 151 (1973), holding that a past deficiency in collections of depreciation cannot be subsequently recouped without evidence of an inadequate return in the year of the deficiency, that citation being offered by way of analogous support for Peoples' premise as to income tax assessments for past years.

The PUC counters that the refund resulted from Peoples' independent decision, after its original 1971 tax return, to revise its 1971 tax position and apply ac-

celerated depreciation to that year, resulting in a tax reduction and refund as to 1971. However, having used a lesser depreciation allowance for 1971 originally, Peoples had earned a return on a portion of the rate base which has now been treated as depreciated during that year, so that there is justification for applying the tax benefit of the 1971 adjustment to the ratepayers, who have been charged on the basis of the property portion not depreciated originally.

Because Peoples has here submitted *no evidence to distinguish the factual situation from that which supported the PUC's like conclusion in R.I.D. 205,* we affirm the PUC's decision as to this income tax refund adjustment, both as to its exclusion from rate base and its application, in considering expenses, to the reduction of income tax expense, as hereinafter noted.

### d. Fair Value Conclusion

In reviewing the PUC's final determination as to fair value, we will use the figures employed by the parties in their briefs, without re-including the 1974 employees benefit costs, for the sake of simplification in discussion.

Peoples takes issue with the PUC's finding of fair value in two respects: (1) the finding ignores substantial accepted increases to the companies' original and trended original cost measures; and (2) the PUC insufficiently weighted the trended original cost measure of value. The argument stresses that the current fair value determination, at 265 million dollars, is the same as that found in the last rate proceeding.

Peoples contends that the commission's fair value determination is arbitrary and capricious, in that, although the PUC recognized an increase in plant investment of approximately 4.5 million dollars, it failed to reflect that increased investment in its fair value finding.

As to Peoples' trended original cost measures, the PUC stated: "Our review of respondent's trended original cost study methodology employed in these proceedings indicates that it generally results in a reasonable estimate of trended original cost." Nevertheless, the PUC concluded that the fair value of respondent's property used and useful in the public services remained at 265 million dollars, rejecting Peoples' claim of 292 million dollars. The commission's finding of fair value is 120.5% of the original cost figure.

Although this court has consistently refused to accept magic numbers or formulae in the process of evaluating the Commission's fair value determinations, we have held that where the percentage of fair value to original cost is relatively low, the fair value determination may be suspect, especially where the PUC has not made findings adequate to allow us to perform our judicial role. As President Judge BOWMAN, writing for this court in *Pennsylvania Gas and Water Co., Water Division v. Pennsylvania Public Utility Commission*, 33 Pa. Commonwealth Ct. 143, 151, 381 A.2d 996, 1000 (1977), observed:

> Once again, we decline to conclude that *this figure alone* [121 percent of net original cost] establishes an abuse of discretion per se, because there may exist a situation, however improbable, in which stability of prices for materials, increased labor productivity, enhanced technological efficiency, or some combination thereof would make reproduction cost sufficiently low that a reasonable fair value figure may exceed net original cost by a lesser percentage. (Emphasis in original.)

In that case, with no evidence of such an improbable situation, and in the light of other aspects (including a fair value finding *less* than the fair value found for an earlier test period just two years removed), we held that the PUC had abused its discretion.

However, in that case the fair value finding (at 121 percent of net original cost) was 57 percent of the average of five-year trended original cost and original cost—the accepted five-year trended original cost being there 274.9 percent of original cost. Here, with the accepted five-year trended cost at 162.1 percent of original cost, the fair value finding (120.5 percent of original cost) equals 92 percent of the average of five-year trended original cost and original cost.

Thus, with cost-measure differences here of lesser magnitude, we cannot condemn the fair value finding on the basis of its relationship to original cost.

Nevertheless, the PUC order gives us no basis for approving a fair value at such a ratio. The PUC, enumerating but not responding to the issues raised as to the fair value determination, concluded that: "Taking all of the 'relevant facts' into consideration, we do not find our fair value finding of $265,000,000 to be unjust or unreasonable."

The problem is that the PUC order, although acknowledging that its fair value determination remains the same as that earlier found in R.I.D. 205, and noting Peoples' claim that original cost and trended original cost measures have since increased, gives no inkling whatsoever of the PUC's reasoning and basis for rejecting such factors.

As this court has done previously, where the commission has, in similar conclusory language, simply reiterated the correct legal principles guiding its determinations, but has failed to fulfill its factfinding duty, by stating its findings and reasoning without a reasonable degree of specificity, we must remand to the PUC for findings adequate for purposes of review. *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission*, 38 Pa. Commonwealth Ct. 614, 394 A.2d 1063 (1978); *Columbia Gas of Pennsylvania*

*Inc. v. Pennsylvania Public Utility Commission,* 42
Pa. Commonwealth Ct. 118, 400 A.2d 1321 (1979).

## 2. FAIR RATE OF RETURN

With respect to the fair rate of return on fair
value, to which every utility is entitled by law, Peoples takes issue with the PUC's setting of fair rate of
return at 8.63% as unsupported by the record. Peoples had sought 9.61% as a fair return.

The utility brief argues strenuously that the heart
of the PUC's error is its finding of a 10.05% cost of
common equity, as to which Peoples claims that 12%
is proper. The elements of the PUC's determination
of fair return, including the generalized capital structure ratios as to which there is no dispute, are set forth
in the following table, with Peoples' claims as to different percentages annexed in brackets:

|  | Capital Ratios % | Capital Cost Rates % | Capital Cost Components % |
|---|---|---|---|
| Long-Term Debt | 47 | 6.95 | 3.27 |
| Preferred Stock | 3 | 11.27 | 0.34 |
| Common Equity | 50 | 10.05 [12.00%] | 5.02 [6.00%] |
| Cost of Capital |  |  | 8.63 [9.61%] |

The primary evidence in the record concerning fair
return is the testimony of one witness, Peoples' expert, Mr. Joseph F. Brennan, president of a public
utility consulting firm. The PUC order summarizes
much of his evidence and, as indicated by the above
table, accepts his recommendation of 11.27% as to cost
of preferred equity but differs from his 7.29% conclusion as to cost of debt by adopting the 6.95% figure
noted above. Thus, the sole remaining fair return dispute centers upon the determination of cost of common
equity.

Because Peoples' common stock is wholly owned by its parent Consolidated Natural Gas Company, Consolidated is the sole source of Peoples' capital requirements. Because Consolidated's capital structure, with long-term debt limited to 50% by indenture, is not typical of the natural gas utility industry, and because Consolidated itself is more diversified than Peoples, the problem of determining cost of equity is similar to that discussed in *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa. Commonwealth Ct. 135, 317 A.2d 917 (1974), where the utility's financing also came entirely from its parent, which likewise had substantial interests dissimilar from the subsidiary.

In such a situation, it is obviously more difficult to relate the specific company's actual experience to fair return and to weigh proven future operations, as required by *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 126 A.2d 777 (1956); when peering through the screen of the parent company's structure and activities, it is also difficult to weigh considerations such as the specific utility's financial structure, credit standing, dividends, interest, risks and other features, as required by *Riverton Cosolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958).

In such a case it may be necessary to look at the capital structure and costs of comparable public utilities. *See Wall v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 35, 125 A.2d 630 (1956).

Hence, in a case like this, as we have noted, "there is no magical formula; it's a matter of judgment based upon the record presented." *Lower Paxton Township, supra*, 13 Pa. Commonwealth Ct. at 144, 317 A.2d at 922. *See also, Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.*, 19 Pa. Commonwealth Ct. 214, 231, 341 A.2d 239, 248 (1975).

Our scope of review is, of course, limited to a determination of whether constitutional rights have been violated, an error of law committed, or if there is a lack of substantial evidence to support the findings, determination or order of the PUC. *Pennsylvania Gas & Water Co. v. Pennsylvania Public Utility Commission*, 33 Pa. Commonwealth Ct. 143, 148, 381 A.2d 996, 999 (1977).

Here the PUC order, after reviewing Mr. Brennan's testimony and opinions, generally distinguishes one of Mr. Brennan's comparisons, made with Minnesota Gas Company, and then states the commission's different conclusion, expressing its reasoning only as follows:

Considering Consolidated's level of common equity, corresponding risk rate, and leverage advantage, when compared with the barometer data, and based on available evidence, we find respondent's cost of equity capital in these proceedings to be in the area of 10.05 percent on fair value and 13.59 percent on original cost.

*Fair Return*

Having given consideration to the testimony and evidence in these proceedings, we find a fair rate of return for respondent to be 8.63 percent on fair value and 10.4 percent on original cost.

In *Lower Paxton, supra,* we noted:

The PUC went into great detail in its adjudication on why it used evidence concerning the cost of equity capital. . . .

13 Pa. Commonwealth Ct. at 144, 317 A.2d at 922.

In this case, as can be readily seen, we can make no such statement. Here, for the lack of specific findings, "we are frustrated in the performance of our judicial review" *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 33 Pa. Commonwealth Ct. 403,

409, 381 A.2d 1337, 1340 (1978). The PUC may have had good reason to find the cost of common equity lower than the cost of preferred equity, but we are left in the dark as to that reasoning. Similarly we can see that the PUC felt compelled to depart substantially from the relevant indications afforded by comparable earnings-price ratios, but we are unable to divine why. With the 10.05% cost of common equity being 3.1 percentage points in excess of the 6.95 debt cost determination—2.76 percentage points in excess of the 7.29 debt cost claimed—the cost of common equity finding could be close to being within the "scope of the evidence," *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission, supra, Lower Paxton Township, supra,* because Mr. Brennan testified that the normal spread between debt and common equity costs averages 3.4 percentage points, and also that it can be between 4 and 6%. However, with no real approach indicated by the commission, we are left without a clue on that possibly pertinent consideration.

Because the cost of common equity for Peoples must be determined in the face of the complication of financing through the parent, we perhaps cannot expect the "precise mathematical calculations" which we sought in *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 45 Pa. Commonwealth Ct. 610, 618, 405 A.2d 1055, 1060 (1979). However, as in that case, we are left "in the position where we simply cannot tell as a matter of law whether the PUC abused its discretion or not."

Therefore, as in the previous situations above cited, we must remand with the requirement that the PUC set forth its reasoning. Rather than the mere listing of factors and an enumeration of figures, we must have a statement of reasons for departing from the testimonial conclusions, and the weights and considerations assigned in doing so—in other words, an

articulation of the process which the PUC majority necessarily followed in reaching its cost of common equity determination. As noted above, the final evaluation of fair return depends entirely upon the pivotal component of cost of common equity.

### 3. REVENUE

The only revenue adjustment contested by Peoples is the PUC's upward adjustment of the annual revenue amount to allow for an "abnormally warm winter" in 1975. For both residential and commercial customers, the total weather normalization adjustment applied by the PUC was an increase of $3,432,000.

The PUC's conclusion as to a relatively warmer winter was quantified, in the context of a 30-year average, as having a number of degree days 4.4% below that average. The normalization factor was determined by applying that percentage to the test year data for the price and volume of gas sold.

There is no doubt that a typical test year figures may be adjusted, at least "where some unusual and non-recurring item is the cause of the distortion." *Pittsburgh v. Pennsylvania Public Utility Commission*, 187 Pa. Superior Ct. 341, 361, 144 A.2d 648, 659 (1958). In that case, an adjustment of gas sales revenues was approved on the basis of the occurrence of a steel strike.

Peoples attacks the normalization on the ground of lack of supporting evidence, failure of the PUC to give advance notice of the approach, rejection of weather normalization in other states, the PUC's disinclination to use the approach in the past and, perhaps most strenuously, the alleged inappropriateness of the 30-year average.

We must note that the record does contain sufficient evidence to support the approach taken by the PUC, if the basic premise of weather normalization by

comparing numbers of degree-days be accepted in the first instance.

The fundamental question turns on the possibility of a weather normalization factor being too speculative, which in turn may well depend upon the appropriateness of a 30-year average as a realistic tool for smoothing a revenue estimate based upon a test year, and upon the use of degree-days as a heating demand yardstick without considering winds and other climatic factors.

From the fact that the test year was colder than the five-year average, Peoples argues that the 30-year average might have been chosen by the PUC simply to provide a basis for upward adjustment of revenues. Also, Peoples points out, if there were evidence of a general warming trend in recent years, the use of an average based upon the past 30 years would be misleading because actual future revenues in a temperature-sensitive industry would necessarily fall below the revenues derived from such an average as a standard.

On the other hand, the use of the degree-day approach to normalization represents a more specific quantification than any approach used in the past. In the only appellate consideration of degree-day comparisons to which our attention has been directed, the Superior Court expressed an open mind of the courts to that approach, stating:

> There may be merit in the city's proposed adjustments to revenues, expenses, and allocation of cost to reflect 10-year average temperatures.

*Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 60-1, 112 A.2d 826, 832 (1955). Although the court there refused to disturb the PUC's reliance upon test year average temperatures alone, the discretion of the commission in making such ad-

justments was affirmed. As a rule, the commission has a wide area of discretion as to adjustments of test year data if there is substantial evidence to explain the action. *Pittsburgh v. Pennsylvania Public Utility Commission, supra,* 182 Pa. Superior Ct. at 560, 128 A.2d at 376 (1956).

With the caution that we can rightly expect the PUC to follow a consistent path hereafter in pursuing weather normalization approaches and choice of average-temperature periods, we believe that the weather normalization specifically set forth in the PUC order here is reasonably within the commission's judgmental discretion. Because the use of the degree-day approach is one of several accepted methods (with no one method being universally accepted), any indictment of its apparent reasonableness must be found, if at all, in future proceedings.

## 4. COSTS AND EXPENSES

We will also briefly review contested items as to allowable costs and expenses.

### a. Rate Case Expense

In support of a claim for additional annual rate case expense in the amount of $106,399, Peoples submitted invoices covering $166,847 of billed rate case expense and an estimate of $30,000 additional legal expense, so that the total revised claim was approximately $196,000. On the basis that the previous rate case expense totaled $140,000, the PUC considered the current claim to be excessive and allowed only $150,000 for the present case, requiring aggregated and unamortized rate case expense to be amortized over five years instead of three years.

We recognize that the PUC is empowered to scrutinize rate case expense carefully. *See Scranton-Spring Brook Water Service Co. v. Public Service*

*Commission,* 105 Pa. Superior Ct. 203, 228, 160 A. 230, 239 (1932). Furthermore, assigning a useful life of five years for new rates cannot be said to be unreasonable. We also find no error in the PUC placing a ceiling on rate case expense by referring to previous rate proceedings of the same company and adding an increment for cost inflation.

Although we therefore find no error of law or fact in the rate case expense determination, we will consider this issue left open for possible revision in view of the necessity of remand on the fair value and fair return issues.

### b. Computer Service Expense

Peoples' claim of $377,887 for computer services supplied by an affiliated company during the test year was adjusted for test year purposes by the PUC through the disallowance of $52,548. The PUC's reasoning was based upon an average of computer expenses for the years 1973-74-75, rejecting Peoples' claim that 1974 was atypically low on the ground that the lower 1974 charge reflected an advanced computer system which could be expected to provide more cost-efficient service on a continued basis. We find the record evidence sufficient to support the adjustment made by the commission.

### c. Reduction of Income Tax Expense

We affirm the adjustment made by the PUC as to income tax expense because that element is entirely dependent upon our affirmance of the original cost adjustment made by the PUC with respect to the 1971 income tax refund, discussed under heading 1c above.

### 5. RATE STRUCTURE

Petitioners United States Steel Corporation (USS) and Allegheny Ludlum Industries, Inc. allege that the

portion of the PUC's January 13, 1978 order which approves the rate structure, proposed by Peoples in Supplement No. 1 to Tariff No. 37, is erroneous in several respects. Petitioners contend that the rate structure is not supported by substantial evidence in the record, that the rates are unjust and unreasonable in violation of Section 301 of the Public Utility Law, and finally, that the rates are discriminatory, in that the rate structure establishes unreasonable differences among the customer classes in violation of Section 304 of the Public Utility Law.

Section 301, 66 P.S. §1141, provides that:

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. . . .

Section 304, 66 P.S. §1144, states that:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, municipal corporation, or subject any person, corporation or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. . . . Nothing herein contained shall be deemed to prohibit the establishment of reasonable zone or group systems, or classifications of rates. . . .

In *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa. Commonwealth Ct. 184, 281 A.2d 179 (1971) Judge KRAMER dealt with the meaning of these provisions as applied to rate structure: As long as the classification of customers is reasonable or is founded upon some reasonable basis, a utility may charge different rates for dif-

ferent classes of customers; whether the classification is reasonable is a question of fact to be determined by the finder of fact, the PUC.

The essence of Section 304 is that rates for one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service. Before a rate can be declared unduly preferential and therefore unlawful, there must be not only an advantage to one, but a resulting injury to another.

Mere differences in rates between classes of customers does not establish unreasonable discrimination. *Philadelphia v. Pennsylvania Public Utility Commission*, 162 Pa. Superior Ct. 425, 57 A.2d 613 (1948).

The cases have established that customer classifications and attendant rate differences may be justified by a variety of considerations, including:

[T]he quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or . . . differences of conditions of service, or cost of service. . . .

*Philadelphia Suburban Transportation Co., supra,* 3 Pa. Commonwealth Ct. at 197, 281 A.2d at 186.

However, there is no set formula for determining proper ratios among the rates of different customer classes. *Natona Mills, Inc. v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. 263, 116 A.2d 876 (1955). What is reasonable under the circumstances, the proper difference among rate classes, is an administrative question for the commission to decide. This court's scope of review is limited.

Peoples serves customers on separate rate schedules: Rate GS—general service for residential and commercial customers; Rate SVI—small volume industrial service; and Rate LVI—large volume industrial service. The following table indicates how Tariff No. 37 and Supplement No. 1 proportionately affect each customer class:

| Customer<br>Class | Percent Increase<br>Tariff No. 37 | Percent Inc.<br>Supp. No. 1 |
|---|---|---|
| Residential | 4.04% | 7.96% |
| Commercial | 4.27% | 8.19% |
| SVI | 4.12% | 19.27% |
| LVI | 4.16% | 22.02% |

In *Natona Mills, Inc., supra,* the court approved a rate structure which effected a 21.42% rate increase for one class of customers consisting of twenty-seven large users, with no increase in the rates of the utility's 45,281 general customers. The Superior Court noted that:

> [T]here is no law or usage in the industry which sets up a formula for determining a proper ratio between the rates of large industrial and, for example, domestic or residential users.

179 Pa. Superior Ct. at 268, 116 A.2d at 879.

It is well settled that the establishment of a rate structure is an administrative function peculiarly within the expertise of the commission. *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 78 A.2d 35 (1951). Further, this court has continually recognized that the findings of the commission, if supported by competent evidence, will not be disturbed. *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 173, 390 A.2d 865 (1978); *Philadelphia Suburban Transportation Co. v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 184, 192-94, 281 A.2d 179, 185 (1971).

We have held that a cost-of-service study is one type of substantial evidence which will support the commission's conclusion that the proposed increases in rates are just and reasonable. Here, the cost-of-service study establishes that the class of revenues proposed by Peoples' proposed rates closely match the cost responsibility of each class. Further, the return customer class produced by Supplement No. 1 rates

approximate Peoples' overall rate of return; the rate of return produced by Supplement No. 1 for the large volume industrial customer is 12.58% and the total rate of return is 12.33%.

However, petitioners allege that the commission erred in finding that Peoples' cost-of-service study correctly allocated certain cost factors, including distribution and storage costs. Further, petitioners state that the study failed to reflect the effect of potential curtailment on the seasonal demand patterns of the large industrial user, and did not reflect the inherent economies of scale operative in a natural gas distribution system.

First, petitioners claim that Peoples' allocation of distribution costs was erroneous. They claim that the study over-allocated fixed costs of the distribution system to the industrial users, thereby causing the proposed rates to be excessive, unreasonable and discriminatory. Petitioners allege that the evidence of record indicates that the cost-of-service study fails to reflect the fact that unit costs of distribution decrease as output is increased.

However, we find sufficient evidence in the record to support the commission's conclusion that, "The most important cost of delivering an MCF of gas is the cost of replacing that gas and the most important cost factor is the commodity factor or the volume of service taken."

Second, petitioners contend that Peoples' allocation of the cost of storage plant by assigning 50% of the cost to "winter service" and 50% to "demand charge" was arbitrary. USS contends that this technique does not adequately assign responsibility among user classes for the seasonal character of demand. USS in particular contends that the storage plant was not built to serve the industrial customer but rather was built to serve residential customers.

Because large volume industrial users are curtailable customers, USS further states that imposition of such a large portion of storage charges is even more inequitable.

As to petitioner's objections to the allocation of the storage plant costs, the commission held that:

> Curtailments are now a fact of life and it is further fact that if it were not for the storage plant of the respondent, or any gas utility with storage plant, large industrial customers, being of low priority, would be curtailed more during the peak winter season than they currently are being curtailed. Thus contrary to USS's conclusion, high load factor customers do derive a benefit from the storage plant through decreased curtailments.

In *United States Steel Corp. v. Pennsylvania Public Utility Commission, supra,* USS challenged the allocation of production and distribution costs of a gas manufacturing plant, alleging that it did not receive manufactured gas, and therefore the costs were erroneously allocated to them. There, we upheld the commission's findings and conclusions to the effect that industrials do benefit from manufactured gas by way of displacement; manufactured gas reduces the industrial customer's curtailment by the amount of the gas produced. Here also there is substantial evidence to support the commission's findings and conclusions that storage plant costs are appropriately allocated to industrial users.

USS states generally that Peoples' cost of service study failed to consider adequately the effect of potential curtailment on the large volume industrial user. Further, USS takes issue with the commission's conclusion that:

> Since industrial customers are being curtailed, they are not able to purchase all the gas they de-

mand at current prices. For that reason, the value of the last unit of gas consumed by the curtailed users exceeds the price which they are willing to pay for the gas. Therefore the value of the gas sold to curtailable customers exceeds the current market price period. Value of service considerations actually indicate, then, that rates charged to curtailable customers may be understated.

USS contends that there is no evidence in the record which supports such a statement and therefore the commission's conclusion is not based on sufficient evidence.

This court has recognized the commission's multifaceted approach to rate structure determinations. We cited with approval a portion of the commission's order in *Philadelphia Suburban Transportation Co., supra,* stating that:

Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. *Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services.* . . . (Emphasis added.)

3 Pa. Commonwealth Ct. at 197, 281 A.2d at 186.

In this case the commission correctly considered the evidence of record: curtailment and gas shortages, volumetric costs, conservation incentives and alternative fuel costs—all economic facts well documented in the record and within the particular expertise of the commission.

Finally petitioners allege that, because the commission took issue with several of Peoples' allocation factors in the cost-of-service study, the commission should have ordered Peoples to restructure its study.

In particular, petitioners take issue with that part of the cost-of-service study which, in apportioning cost responsibility, used 1974 industrial sales volumes and 1975 general service sales volumes, claiming that, because the 1974 industrial sales volumes were the highest, the use of that data creates a significant overstatement of cost allocations to the industrial user.

Multiple factors necessarily affect the appropriateness of a rate structure. In *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 393, 126 A.2d 777, 785-86 (1956), the Superior Court recognized that:

> [S]uch factors as the recent and past rate history and program of the utility, the sales characteristics of the various classes of consumers, the practicality of admistering the schedules, the value of the service to the various consumers, the promotional aspects of the rates, and the competition in certain areas by other fuels.

In *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 144 A.2d 648 (1958), the Superior Court recognized that principles of value of service were appropriate considerations in rate structure determinations.

Petitioners have emphasized the cost-of-service study, to the exclusion of other equally appropriate factors. In *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission, supra,* this court approved the commission's consideration of factors including: quantity of electricity used, nature of the use, time of the use, pattern of the use, differences in conditions of service and cost of service, in addition to economic facts and circumstances which affect rates and services.

The establishment of a rate structure is an administrative function peculiarly within the expertise of the commission. Reasonableness of rates and the differ-

538

ence between rates are factual questions for the commission whose findings must be upheld if supported by competent evidence. *United States Steel Corp., supra,* 37 Pa. Commonwealth Ct. 195, 211, 390 A.2d 849, 857.

The commission noted that the allocation methods used by Peoples were identical to those presented at the three previous proceedings. However, the commission did correct Peoples' method of allocating costs based upon annual and winter volumes, indicating that the three-year average allocation method (previously approved by the commission in two previous filings) be used. In the summation, the commission concluded that Peoples' indicated cost of service to each customer classification is within an acceptable range of reasonableness. Noting that cost-of-service studies are only one element in fixing rates, the commission held that there was no reason to alter respondent's proposed rate structure, even in light of the criticisms of the cost-of-service study.

A mere difference in rates between classes of customers does not establish unreasonable discrimination. Although Supplement No. 1 does not effect a uniform increase among Peoples' classes of customers, the evidence does not establish unreasonable nor impermissible discrimination. *Pittsburgh v. Pennsylvania Public Utility Commission, supra,* 182 Pa. Superior Ct. at 394, 126 A.2d at 786.

Therefore, we affirm that portion of the commission's order establishing a rate structure under Supplement No. 1.

## ORDER

AND Now, this 5th day of December, 1979, the final order of the Pennsylvania Public Utility Commission dated January 13, 1978 is affirmed to the extent set forth in the opinion herein with respect to determinations as to revenues, costs and expenses, the fair

value elements of minimum bank balances and income tax refunds, and rate structure, but is otherwise set aside as to fair value and rate of return; and the record is remanded to the commission for proper findings and statements of reasons to support fair value and fair rate of return determinations in conformity with the opinion herein on those matters. The commission may, but need not, receive additional evidence and, upon adopting such proper findings and statements of reasons, shall revise and modify its final order as to such matters and to such extent, if any, as may be made necessary by its reconsideration.