560 A.2d 889

**CITY OF PITTSBURGH, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 3, 1989.

Decided June 19, 1989.

Reargument Denied Aug. 30, 1989.

---

668

Ashley C. Schannauer, Asst. City Sol., D.R. Pellegrini, City Sol., City of Pittsburgh, Pittsburgh, for petitioner.

Charles F. Hoffman, Johnnie E. Sims, Regina L. Matz, Kathryn G. Sophy, Asst. Counsel, Bohdan R. Pankiw, Deputy Chief Counsel, John G. Alford, Acting Chief Counsel, Daniel P. Delaney, Chief Counsel, Pennsylvania Public Utility Com'n, Harrisburg, for respondent.

Thomas P. Gadsden, Alan L. Reed, Paul R. Bonney, Morgan, Lewis & Bockius, Philadelphia, for Western Pa. Water Co.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, BARRY, PALLADINO, McGINLEY and SMITH, JJ.

CRAIG, Judge.

The City of Pittsburgh (city) has appealed an order of the Pennsylvania Public Utility Commission (PUC), dated July 1, 1988, which rejected the city's complaints against the Western Pennsylvania Water Company (WPW) alleging that WPW's rates illegally discriminate against ratepayers in the Greater Pittsburgh Area (defined below) as against WPW customers in WPW's other service areas. The city filed two complaints, the first challenging rates in effect in November, 1987, and the second complaint challenging the rates proposed by WPW in its request for a general rate increase then pending before the PUC.

The city's complaints look to section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, which prohibits public utilities from granting unreasonable preferences or advantages and concludes by stating:

No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

The issues in this case constitute a further evolution of the rate structure questions raised by the city against WPW, and decided adversely to the city in a PUC decision affirmed by this court in *City of Pittsburgh v. Pennsylvania Public Utility Commission (Pittsburgh I)*, 106 Pa. Commonwealth Ct. 437, 526 A.2d 1243 (1987).

Because WPW now consists of water plants formerly held by sixteen separate corporations, merged in 1972, WPW rate cases before the PUC in 1973, 1978, 1980, 1983 and 1984 embodied PUC approval of a gradual consolidation of the sixteen plants or districts into six, as of a January 1985 order of the PUC. *Pittsburgh I*, 106 Pa.Commonwealth Ct. at 441-2, 526 A.2d at 1245-6.

An understanding of the geographical locations of the WPW districts is necessary to appreciate the city's rate

structure position. Because WPW's component plants originally belonged to distinct companies in diverse locations within Western Pennsylvania, WPW's complex is quite different from a single interconnected water system. Appended as an exhibit to the city's brief is a map showing the distribution of the sixteen locations in Western Pennsylvania. Although the illegibility of the locational designations on that map limits its usefulness severely, it does illustrate that WPW presently consists of approximately ten service areas, which appear on the map as islands of varying size scattered throughout the western third of the Commonwealth.

In *Pittsburgh I,* this court affirmed a PUC decision which approved the consolidation of former districts to just two in number, but with six distinct rate zones within one of those two districts as follows:

I. Warren District

II. Western District
1. Butler Rate Zone
2. Clarion–Punxsutawney Rate Zone
3. Connellsville–Uniontown Rate Zone
4. Ellwood City Rate Zone
5. Indiana–Kane Rate Zone
6. Rate Zone ("Greater Pittsburgh") Comprised of: Pittsburgh, Monongahela, Valley, McDonald, Washington

For the purposes of this opinion, this court will adopt the label applied by the city's witness to the rate zone last described above. He referred to the Pittsburgh, Monongahela, Valley, McDonald and Washington rate zone as the "Greater Pittsburgh District," stressing that water operations and distribution within that area are interconnected. Although there is interconnection between Connellsville and Uniontown, all of the other water systems stand alone, not connected to any second one. Those separate systems are Butler, Clarion, Ellwood City, Indiana, Kane, Kittanning, New Castle, Punxsutawney and Warren.

In the record, the city presented a study to show that the Greater Pittsburgh ratepayers subsidize the remainder of WPW ratepayers each year in amounts ranging from $2.3 to $2.9 million. The city's witness also testified that revenues from Greater Pittsburgh ratepayers, under the proposed rates, would be at least 4.36% in excess of the costs incurred by WPW in providing service to the Greater Pittsburgh Area, which would permit ratepayers in other areas to pay an average of 11.32% less per year than the costs applicable to those other areas.

The PUC, in its final order, responded to the city's rate structures case by stating:

> We concur with the ALJ that the most persuasive factors are our own previous actions regarding both WPW's consolidation and the Pennsylvania–American Water Company (formerly Keystone Water Company), and the recent decision of the Commonwealth Court in the City of Pittsburgh v. Pa. PUC [Pittsburgh I]....:
>
>> 'Given the history of the gradual and continuing consolidation of the water company, we hold that the commission is not obliged to repeatedly explain and justify its approval of the goal of single tariff pricing which the commission has been allowing the water company to implement gradually since the late 1950's [Pittsburgh 1, 106 Pa.Commonwealth Ct. at 445, 526 A.2d at 1247.]'
>
> We agree with the ALJ that no persuasive new evidence or legal argument has been offered by the City in support of its attack on the Company's Single Tariff Pricing Rate Structure. For these reasons, we shall deny the City of Pittsburgh's exception on this issue and shall dismiss the City's complaint filed against the Company's present rates.

PUC Final Order, Docket No. C–871582 pp. 96–7 (footnotes omitted).

The city's Statement of the Questions Involved combines advocacy with analysis. The city asks: (1) Is the PUC's implicit finding, negating illegal discrimination, based upon substantial evidence? (2) Did the PUC's reliance upon

previous decisions constitute an error of law? (3) Did the PUC's refusal to incorporate the city's claims in findings operate to allow the city's claims to be misconstrued and disposed of pursuant to an inapplicable rationale? and (4) Does the PUC's action establish an illegal burden of proof?

■ In essence, however, the issue pursued by the city is: Does the rate structure here approved result in a discrimination against some localities or classes of customers, falling within the condemnation of section 1304? Here, as in *Pittsburgh I*, the city is not challenging the rate increase granted to WPW by the PUC, but only the rate structure.

■ *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 79 Pa.Commonwealth Ct. 445, 470 A.2d 654 (1984), has reiterated that the establishment of rate structure is an administrative function peculiarly within the expertise of the commission.

As the geographical pattern in the present case clearly shows, the contending parties in this kind of case can describe, and select from, an infinite number of rate zones. Although the city's selection of the Greater Pittsburgh District, as conceived by its witness in this case, is rationally based upon the fact that it is comprised of interconnected system components, neither the PUC nor the courts have ever held that the presence or absence of physical and operational interconnection necessarily establishes a conclusive class in rate structure determinations.

In the record here, the city has made good use of the PUC's previous directions that separate accounting be maintained for rate zones and systems which have been consolidated into the Western District. Accordingly, the city has emphasized the cost-of-service factor. However, in *Pittsburgh I*, this court insisted that other relevant factors must also be considered, including the recent and past rate history of the utility, the practicality of administering the rate schedules and the value of the service. *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47

Pa.Commonwealth Ct. 512, 409 A.2d 446 (1979).

Because the very concept of rate structure assumes some difference in rates, the test of discrimination has been a determination that some customers are paying "an unreasonably high rate" in relation to other customers paying "unreasonably low rates." *Philadelphia Electric Co.*, 79 Pa.Commonwealth Ct. at 452–53, 470 A.2d at 658. In *Pittsburgh I*, because the difference between the commission's approved rates and the city's proposed rates was only $1.84 per year, we agreed with the PUC that the difference of that magnitude was de minimis rather than unreasonable.

In the present record, the city's study showed that, under the rates previously approved, Greater Pittsburgh ratepayers were paying 5.76% over costs incurred by WPW in providing service to that area, permitting ratepayers in other areas to pay an average of 16.37% less in revenues per year than the costs incurred to service those other areas. However, pursuant to WPW's proposed rates, in the related rate proceeding here, Greater Pittsburgh ratepayers would pay 4.36% in excess of their costs while the cost differential for ratepayers in other areas would become 11.32%. Therefore, the evidence indicates that rate and rate structure approvals in this case would result in narrowing the alleged subsidy separating the Greater Pittsburgh ratepayers from other ratepayers.

The point thus illustrated, that the percentage discrepancies emphasized by the city are narrowing rather than widening, as costs rise overall, was well communicated by a series of findings in the rate structure analysis made in this case by Administrative Law Judge Morris J. Solomon, as follows (RR 150–1a):

> The foundation of Pittsburgh's position is the study performed by its witness, James D. Cotton. From his findings, we have extracted certain pertinent figures:

## COMPARATIVE RATES OF RETURN

|  | Historic Test Year | Future Test Year |
|---|---|---|
|  | % | % |
| WPW Consolidated | 10.43 | 8.14 |
| 'Greater Pittsburgh District' | 11.61 | 8.94 |
| Pittsburgh District | 10.74 | 7.46 |
| Clarion/Punxsutawney | 10.76 | 7.53 |

(Pittsburgh Statement No. 1, Schedules 3 and 4)

From the foregoing, we note Mr. Cotton has demonstrated that his hypothetical Greater Pittsburgh District provides WPW with a higher than system-wide rate of return in both the historic test year and in the future test year. Equally interesting, his data shows that the gap between the WPW Consolidated rate of return and the Greater Pittsburgh rate of return has narrowed from 1.18% to 0.8%. In addition, we can see two districts, Pittsburgh and Clarion/Punxsutawney, have moved from the position of subsidizing other districts to becoming the recipients of subsidization, as measured with respect to the WPW system-wide rate of return. This tends to corroborate the testimony of WPW's Hugus that there will always be some cross-subsidization between geographic areas and, depending on the scheduling of capital investment in plant, such subsidies are usually short-lived. (WPW Statement R–1–B, pp. 15–16) Also instructive is Mr. Hugus' testimony concerning the Company's plans for major capital investments in the Pittsburgh area in the coming years. (WPW Statement R–1–B, p. 16)

In our judgment, the rate structure proposals of the City of Pittsburgh should be rejected and its complaint against WPW's present rates should be dismissed.

Thus the ALJ's decision, followed by the PUC, shows that the rate structure decision here constitutes an acceptable movement toward the "single tariff pricing policy" which the PUC has followed with consistency with respect to WPW. This court recognizes that "single tariff" represents a misnomer, strictly speaking, in view of the maintenance of seven separate rate categories in WPW's rate

structure. However, there is solid justification for the PUC to take a total company approach. As the PUC stated in its 1986 decision, *Pennsylvania Public Utility Commission v. Western Pennsylvania Water Co.*, 72 PUR 4th 103, 147–48 (1986), justification for viewing the company as an integrated economic unity includes these considerations:

1. A larger rate and revenue base ameliorates the impact of major capital additions needed from time to time in every service area;

2. A larger revenue base promotes flexibility in timing and financing major capital additions;

3. The impact of instability resulting from changes in sales volumes is mitigated when the effect of such volumetric factors is spread over a larger economic base; and

4. The reduction of the number of accounting units and the number of individual rate filings results in administrative efficiency with a potential to reduce costs to ratepayers.

The commission decision in this case represents a continuation of its policy of approaching uniformity on a gradual basis.

This court's conclusion must be that the PUC's rate structure determinations in this case do not result in any rate differences which could be considered unreasonable in scope and therefore within the condemnation of section 1304.

In view of our conclusion, this court need not consider WPW's contention that the city lacks standing, particularly in view of the WPW's tardiness in not raising that issue until the case reached this court. *Erie Indemnity Co. v. Coal Operators Casualty Co.*, 441 Pa. 261, 272 A.2d 465 (1971).

## ORDER

NOW, June 19, 1989, the order of the Pennsylvania Public Utility Commission entered July 1, 1988, at PUC Docket Nos. R–870825 and C–871582, is affirmed.