IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NazAarah Sabree,                        :
Small Business Advocate,                :
                    Petitioner          :
                                        :
            v.                          :    No. 1307 C.D. 2022
                                        :    Argued:  April 9, 2025
Pennsylvania Public                     :
Utility Commission,                     :
                    Respondent          :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge[1]
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE STACY WALLACE, Judge
           HONORABLE MATTHEW S. WOLF, Judge


OPINION BY
PRESIDENT JUDGE COHN JUBELIRER            FILED:  November 17, 2025


       NazAarah Sabree, on behalf of the Office of Small Business Advocate
(OSBA), petitions for review of the October 27, 2022 Order (October Order) of the
Pennsylvania Public Utility Commission (Commission), denying reconsideration of
the Commission's May 16, 2022 Order (May Order).  In the May Order, the
Commission approved the request of Aqua Pennsylvania, Inc. (Aqua Water) and
Aqua Pennsylvania Wastewater, Inc. (Aqua Wastewater) (together, Aqua) to
allocate a portion of Aqua Wastewater's revenue requirement to Aqua's combined
water and wastewater customer base pursuant to Section 1311(c) of the Public Utility
Code (Code), 66 Pa.C.S. § 1311(c), commonly referred to as "Act 11."  In effect, the

_____

[1] This matter was reassigned to the author on July 31, 2025.

Commission approved Aqua's request to require Aqua Water customers to subsidize a portion of the wastewater costs for Aqua Wastewater customers. OSBA argues the Commission erred in approving this Act 11 wastewater subsidy for two principal reasons: (1) the Commission violated *Lloyd v. Pennsylvania Public Utility Commission*, 904 A.2d 1010 (Pa. Cmwlth. 2006), by viewing the wastewater subsidy and the cost of providing water service "as a whole" for Aqua Water customers, thereby masking the actual cost of providing water service for those customers, and (2) the Commission violated *Lloyd* and Act 11 by not allocating the wastewater subsidy to Aqua's combined water and wastewater customer base on a revenue-neutral basis across customer classifications. After review, the Court vacates the October Order and remands to the Commission for further proceedings consistent with the following opinion.

## I.   BACKGROUND

Aqua provides water service to approximately 450,000 customers and wastewater service to approximately 40,000 customers throughout the Commonwealth. While there is some overlap between Aqua's water and wastewater customer bases, not all Aqua Wastewater customers are Aqua Water customers. Specifically, Aqua Wastewater customers comprise approximately 8.5% of all Aqua customers; thus, Aqua Water customers comprise over 91% of all Aqua customers.

On August 20, 2021, Aqua Water filed Tariff Water-Pa. P.U.C. No. 3 with the Commission, which included a water cost-of-service study (W-COSS). Therein, Aqua Water proposed changes to its base water rates to increase revenue by approximately $86.118 million (16.9%), effective October 19, 2021. The same day, Aqua Wastewater filed Tariff Sewer-Pa. P.U.C. No. 3 with the Commission, which included a wastewater cost-of-service study for its Base, Limerick, East Bradford,

2

Cheltenham, East Norriton, and New Garden operating divisions (WW-COSS). Therein, Aqua Wastewater proposed changes to its wastewater rates to increase revenue by approximately $11.566 million (31.2%), also effective October 19, 2021. Aqua further proposed allocating approximately $20.839 million (30%) of Aqua Wastewater's proposed total revenue requirement to Aqua Water customers pursuant to Section 1311(c) of the Code. In sum, in Tariff Water-Pa. P.U.C. No. 3 and Tariff Sewer-Pa. P.U.C. No. 3 (together, Tariffs), Aqua requested an increase in annual operating revenue of approximately $97.684 million and to allocate approximately $20.839 million of Aqua Wastewater's total revenue requirement to Aqua Water customers as an Act 11 subsidy. No party has challenged the methodology used by Aqua in creating the W-COSS or WW-COSS.

On September 8, 2021, OSBA filed a formal complaint opposing the Tariffs with the Commission.[2] Subsequently, on October 7, 2021, the Commission suspended Aqua's requested rate increases until May 19, 2022, and assigned the matter to the Office of Administrative Law Judge (ALJ) for hearings and a recommended decision regarding the lawfulness, justness, and reasonableness of the rate increases in the Tariffs. After a prehearing conference on October 15, 2021, the ALJ held six public hearings from November 8, 2021, through November 12, 2021.

On December 20, 2021, the ALJ held an evidentiary hearing, during which OSBA challenged Aqua's proposed water revenue allocation. OSBA argued that Aqua's proposal did not move all customers closer to their respective cost-based

---

[2] In addition to OSBA, the Office of Consumer Advocate, Masthope Mountain Community Association, 45 individuals and property owner associations opposing Aqua Water's proposed revenue increase, and 67 customers opposing Aqua Wastewater's proposed revenue increase filed formal complaints with the Commission. The Commission's Bureau of Investigation and Enforcement entered its appearance on September 3, 2021, and the Coalition for Affordable Utility Service and Energy Efficiency (CAUSE-PA) intervened on September 20, 2021.

revenue level and advocated that the Act 11 subsidy be allocated on a revenue-neutral basis across customer classifications. OSBA asserted that this approach ensures residential water customers subsidize residential wastewater customers, and non-residential water customers subsidize non-residential wastewater customers. OSBA also rejected Aqua's counterargument that significant differences in the number and mix of residential to non-residential customers across Aqua's water and wastewater systems warranted any adjustment to its recommendation.

On February 18, 2022, the ALJ issued a Recommended Decision, recommending that the Commission increase Aqua Water's revenue by approximately $15.2 million (2.97%) and Aqua Wastewater's revenue by approximately $16.7 million (45%). The ALJ also recommended the Act 11 wastewater subsidy proposed by the Commission's Bureau of Investigation and Enforcement (I&E), which would allocate approximately $10.439 million of Aqua Wastewater's total revenue requirement to Aqua Water customers instead of the $20.839 million proposed by Aqua. The ALJ explained that Aqua's "primary driver for the proposed revenue increase for both water and wastewater is infrastructure investment" and "Aqua opposes the Act 11 subsidy proposals by [OSBA and the Office of Consumer Advocate (OCA)] because the resulting revenue allocations will cause rate shock in some of Aqua's rate zones and fail to adhere to principles of gradualism." (Recommended Decision at 89.) While "[t]his type of socialization is certainly the underlying premise of Act 11," the ALJ reasoned Aqua's proposed subsidy was not equitable because it was arbitrary and did not produce just and reasonable rates. (*Id.* at 89-90.) In contrast, the ALJ found I&E's proposal equitable because it "consider[ed] the number of water and wastewater customers in each system and balance[d] the goal of moving rates toward alignment with the cost of

4

service, while also mitigating some of the large rate increases that would result if no allocation of wastewater revenue was approved." (*Id.* at 91.)

The ALJ further recommended the Commission adopt Aqua's approach for allocating water revenues. "Although Aqua recognized that OSBA's methodology was a reasonable alternative to revenue allocation," the ALJ concluded that "Aqua demonstrated that [its] allocation is more reasonable." (*Id.* at 92.) In rejecting OSBA's proposed water revenue allocation, the ALJ explained:

> Aqua's proposed allocation of revenues views cost of service as a whole[] and does not attempt to exclude the Act 11 allocation from its analysis. Rather, Aqua moves each customer classification towards its appropriate percentage cost of service including the Act 11 allocation. . . . [I]t appears that OSBA's recommendation to isolate and remove the Act 11 allocation from its analysis is motivated by a desire to decrease the revenue allocated to non-residential customer classifications, while increasing the revenue allocated to residential customers classes. However, from the perspective of customers, the effect of the increase includes both the water increase and the wastewater allocation. [Aqua's] methodology better reflects the cost of service.

(*Id.* (citations and emphasis removed).) The ALJ therefore concluded that "but for the Act 11 subsidy allocated to water customers, [Aqua's] allocation of revenues between all water customer classifications and all wastewater customer classifications is reasonable[] and should otherwise be approved." (*Id.* at 93.)

On February 28, 2022, OSBA filed exceptions to the Recommended Decision, arguing the ALJ's decision violated *Lloyd* and Act 11. Relevant here, OSBA argued the ALJ erred in approving Aqua's proposed water revenue allocation, which "us[ed] a combined water and wastewater revenue, or 'total bill,' evaluation," because it violated *Lloyd's* holding that "ratemaking is to be conducted using each specific service's cost of service." (OSBA's Exceptions at 3.) By performing ratemaking

on a combined revenue basis, OSBA maintained that Aqua's approach masks the actual increase in revenue stemming from Aqua's separate W-COSS and WW-COSS. OSBA further argued that the ALJ erred by rejecting its proposal to allocate water revenue exclusive of the Act 11 wastewater subsidy because, in its view, such an approach is necessary to move each customer classification closer to their respective cost of service, whereas under Aqua's approach, some customer classifications move toward while others move away from their respective cost of service. Finally, OSBA argued the ALJ erred by not recommending how the Act 11 wastewater subsidy should be allocated and requested that the Commission require the subsidy be allocated on a revenue-neutral basis by customer classification.

On May 16, 2022, the Commission denied OSBA's exceptions and affirmed the Recommended Decision as to the rate class allocation of water revenues, including the Act 11 subsidy. Specifically, the Commission approved an annual revenue increase of approximately $50.510 million (9.88%) and $18.741 million (50.55%) for Aqua Water and Aqua Wastewater, respectively. In denying OSBA's exceptions, the Commission explained:

> [The] reasons considered by the ALJ upon which she based her recommendation to approve [Aqua's] allocations of revenues between all water and wastewater customer classifications are just, reasonable, and in the public interest, and should be approved. The OSBA's contention is that Aqua's proposed revenue allocation, which views cost of service as a whole and does not exclude the Act 11 allocation, conflicts with the requirement in *Lloyd* that the basis for individual utility service rates is specific to each service's cost of service. We find this argument unpersuasive. . . . [T]he OSBA's reliance upon *Lloyd* appears to be misplaced as wastewater costs are not stand-alone, separate rates charged to water customers. Therefore, we do not believe that the principles of *Lloyd* have been violated. The OSBA also argues that its proposed water revenue allocation correctly isolates the Act 11 allocation. We disagree. Rather, we find the ALJ's conclusion, that [Aqua's] methodology better reflects the cost of service because

6

> Aqua's proposed allocation views cost of service "as a whole" and moves each customer classification toward its appropriate cost of service, is more persuasive and in the best interest of the public.

(May Order at 228-29.)

Shortly thereafter, OSBA filed a Petition for Reconsideration and Clarification of the May Order (Reconsideration Petition), requesting the Commission reverse its May Order for two principal reasons. First, OSBA argued the Commission should reverse its decision because it violated *Lloyd* by not conducting separate evaluations of Aqua's water and wastewater revenue allocations based on each service's respective cost-of-service study. Second, OSBA argued the Commission should reverse its decision because it violated Act 11 by not allocating the approved wastewater subsidy separately on a revenue-neutral basis by customer classification. On June 8, 2022, the Commission granted the Reconsideration Petition, pending the Commission's further review and consideration of the merits.

On October 27, 2022, the Commission denied the Reconsideration Petition, concluding OSBA did not assert any basis for reconsideration in accordance with *Duick v. Pennsylvania Gas & Water Co.*, 56 Pa. PUC 553 (1982).[3] The Commission explained that the May Order explicitly considered and rejected OSBA's arguments regarding *Lloyd* and Act 11. Therefore, the Commission concluded that OSBA did not identify any new or novel arguments to form the basis for reconsideration.

OSBA now appeals the October Order to this Court.[4]

---

[3] "*Duick* requires that a reconsideration petition identify new and novel arguments, not previously heard, or considerations which appear to have been overlooked or not addressed by the Commission, not a second motion to review and reconsider, to raise the same questions which were specifically considered and decided against them." *Exec. Transp. Co., Inc. v. Pa. Pub. Util. Comm'n*, 138 A.3d 145, 150 (Pa. Cmwlth. 2016) (citation and internal quotation marks omitted).

[4] East Norriton Township, CAUSE-PA, the OCA, and Aqua filed notices of intervention with this Court in December 2022. By Order dated March 27, 2025, the Court precluded East **(Footnote continued on next page…)**

## II.   DISCUSSION[5]

### A.  General Principles

As an initial matter, "[e]very rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the [C]ommission." Section 1301 of the Code, 66 Pa.C.S. § 1301. While "a utility has a constitutional and statutory right to a reasonable rate of return," the "[u]tility bears the burden of proving the justness and reasonableness of the requested rate increase." *Emporium Water Co. v. Pa. Pub. Util. Comm'n*, 955 A.2d 456, 461, 463 (Pa. Cmwlth. 2008); *see also* Section 315(a) of the Code, 66 Pa.C.S. § 315(a) ("[T]he burden of proof to show that the rate involved is just and reasonable shall be upon the public utility."). "What is reasonable under the circumstances . . . is an administrative question for the [C]ommission to decide." *Peoples Nat. Gas Co. v. Pa. Pub. Util. Comm'n*, 409 A.2d 446, 456 (Pa. Cmwlth. 1979).

"It is well settled that the establishment of a rate structure is an administrative function peculiarly within the expertise of the [C]ommission." *Id.* And "this [C]ourt has continually recognized that the findings of the [C]ommission, if supported by competent evidence, will not be disturbed." *Id.* In other words,

> [a]s long as there is a rational basis for the [Commission's] methodology [in establishing a rate structure], such decisions are left entirely up to the discretion of the [Commission] which, using its expertise, is the only one which can properly determine which method

Norriton Township from filing a brief and participating in oral argument because it did not file a brief pursuant to the Court's March 12, 2025 Order. By letter dated March 24, 2025, CAUSE-PA informed the Court that it would neither file a brief nor seek to participate in oral argument.

[5] The Court "review[s] a denial of reconsideration for abuse of discretion," which occurs if the Commission "demonstrates bad faith, fraud, capricious action, or abuse of power" when denying reconsideration. *Exec. Transp. Co., Inc.*, 138 A.3d at 148 n.8 (citation omitted).

is the most accurate given the particular circumstances of the case and economic climate.

*Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997) (quoting *W. Penn Power Co. v. Pa. Pub. Util. Comm'n*, 607 A.2d 1132, 1135 (Pa. Cmwlth. 1992)). "However, on issues of law, 'our standard of review is de novo and our scope of review is plenary.'" *McCloskey v. Pa. Pub. Util. Comm'n*, 225 A.3d 192, 202 (Pa. Cmwlth. 2020) (citation omitted). With these principles in mind, the Court turns to the parties' arguments.

### B. Analysis

OSBA first argues that the Commission erred as a matter of law by "conclud[ing] that[,] for the purpose of determining an appropriate revenue allocation for water service customers, combining the two, separate, cost-of-service results for Aqua['s] [] water and wastewater services on an 'as a whole' basis was just, reasonable, and better reflected the overall 'cost of service' to the customer." (OSBA's Brief (Br.) at 14-15.) In so concluding, OSBA asserts the Commission misread *Lloyd*, and its decision "accomplishes exactly what the Court in *Lloyd* wanted to prevent: the masking of the rates paid for separate utility services." (*Id.* at 16.) Additionally, OSBA argues the Commission violated Act 11 by not allocating the approved wastewater subsidy "on a revenue neutral basis by customer class" because "nothing in Section 1311(c) allows for cross-subsidization between wastewater and water customer classes." (*Id.* at 17-18.) The approved cross-subsidization, OSBA contends, also violates *Lloyd* because it moves customers away from their respective cost of service. Accordingly, OSBA contends the Commission erred because it allowed Act 11 to overtake the "polestar" in setting rates—the cost of providing the service. (*See id.* at 13-17, OSBA's Reply Br. at 8-11.)

9

The Commission responds that it properly exercised its discretion in determining the allocation of water costs because "once the Act 11 subsidy is allocated to the water revenue requirement, that cost is absorbed into the water cost of service and is no longer a separate 'cost' for water ratemaking purposes." (Commission's Br. at 17-18.) Furthermore, the Commission claims that OSBA "attempts to sidestep the actual intent of the General Assembly in passing Section 1311(c), which is to allow factors like gradualism, quality of service, and affordability of rates to come to the foreground." (*Id.* at 28-29.) The Commission therefore posits that *Lloyd* is distinguishable from the instant case and Aqua's method for allocating the wastewater subsidy complies with Act 11.

For its part, Aqua argues that the May Order is consistent with *Lloyd* because the Commission analyzed the cost of service and other valid ratemaking principles (e.g., gradualism and the revenue deficiency identified in the WW-COSS, which the Commission is authorized to allocate to the water revenue requirement under Act 11) to establish an appropriate revenue allocation. Aqua further maintains that the Commission did not improperly combine the W-COSS and WW-COSS to establish water rates and echoes that its method for allocating the Act 11 subsidy is consistent with the Code. In turn, the OCA asserts that no nexus exists between *Lloyd* and Act 11 and the Commission's approval of Aqua's methodology to allocate the wastewater subsidy comports with Act 11.

Just and reasonable rates are the keystone in utility ratemaking. *See* 66 Pa.C.S. § 1301. And it is settled that the cost of providing a utility service is the polestar in achieving just and reasonable rates. *Lloyd*, 904 A.2d at 1020. When setting rates, "[t]he rate made is determined by two factors—what increase in revenues over those produced by existing rates is needed to give the utility a fair rate

10

of return and what increased revenues are going to be allocated in the rates among the various rate classes, i.e., the rate structure." *Id.* at 1015. As explained in *Lloyd*:

> Rate classes are established by taking similarly situated customers with similar characteristics as to the type of service (e.g.[,] residential, commercial and industrial) and the type and demand of service (e.g.[,] amount of usage and demand load) and rates that are designed to recover the cost of serving that class. When a utility files for a rate increase, it must file a cost-of-service study assigning to each customer class a rate based upon operating costs that it incurred in providing that service.

*Id.* at 1015 n.10 (citing Section 53.53 of the Commission's Regulations, 52 Pa. Code § 53.53). Accordingly, while different rates may be charged to different customer classifications, the rate set for each classification must be primarily based on the cost of providing the service for that specific classification. *See id.* at 1015 n.10, 1020. Although other factors may be considered, such as gradualism,[6] by setting rates for each customer classification primarily based on their respective cost of service, the requirement that "rates must be designed to furnish the most efficient and

---

[6] As explained by the Court in *Lloyd*:

> "Gradualism" is a principle of rate design that rates will be gradually increased to avoid "rate shock" .... Large rate increases have the potential to cause "rate shock" among customers. Technically, rate shock applies when a rate increase is associated with a significant drop in usage, reflecting the unwillingness or inability of customers to pay for those services. Due to the inelastic demand for essential services, such as utilities, any decrease in usage is minor and transitory. There is a non-technical definition of "rate shock" which is used to describe the public outcry associated with rate increases. To mitigate both forms of rate shock, the remedy is "gradualism," i.e., phasing in rates or closing rate differentials over a longer period of time allowing consumers to gradually make the adjustments in the "elastic" part of their spending so as to pay for increased utility costs, not to mention lessening the pressure on the Commission and the utilities to dampen rate increases.

904 A.2d at 1018 n.14.

11

satisfactory service at the lowest reasonable price for the greatest number of customers" is satisfied. *Id.* at 1016 (quoting *Phila. Suburban Transp. Co. v. Pa. Pub. Util Comm'n*, 281 A.2d 179, 186 (Pa. Cmwlth. 1971)).

*Lloyd* is instructive on the application of these principles.[7] In *Lloyd*, an electric utility provider requested an increase in distribution and transmission rates, aiming to "limit[] the rate increase for all classes of customers to below 10% of the total bill," which included separate distribution, transmission, and generation services, and "move each customer class closer to the system average rate of return for distribution service." *Id.* at 1015 (emphasis removed). By aiming to keep all customer classifications below a 10% increase in their total bill, the utility provider exacerbated the existing subsidy commercial customers provided to residential customers and obscured that the actual requested increase in distribution and transmission rates was 32.8% because generation costs were capped at the current rates by law. *Id.* at 1015, 1016-17. In approving the requested increase in rates, the Commission reasoned that "a 10% ceiling on rate schedule increases on a total bill basis is appropriate methodology in this case to address the need to move rate schedules closer to the system average rate of return while recognizing the principles of gradualism and mitigation of rate shock." *Id.* at 1018. An *en banc* panel of this Court disagreed, vacating the Commission's order because, by approving the rate increases on a "total bill basis," the Commission "masked" the actual increase in the cost of providing service and allowed gradualism to trump the cost of providing

---

[7] Although *Lloyd* is factually distinguishable from the case at bar because it involved a discrimination claim under Section 1304 of the Code, 66 Pa.C.S. § 1304, in the context of the Electric Generation Customer Choice and Competition Act, 66 Pa.C.S. §§ 2801-2815, neither of which are at issue here, *Lloyd* is applicable because it elucidated the general principles the Commission must follow in ratemaking cases.

12

service as the primary ratemaking concern. *Id.* at 1015, 1020-21. The Court explained that,

> while permitted, gradualism is but one of many factors to be considered and weighed by the Commission in determining rate designs, and **principles of gradualism cannot be allowed to trump all other valid ratemaking concerns** and **do not justify allowing one class of customers to subsidize the cost of service for another class of customers** over an extended period of time.

*Id.* at 1020 (emphasis added). The Court further disapproved of applying gradualism "on a total bill basis when each service is a stand-alone rate structure," such as the electric distribution, transmission, and generation services at issue in *Lloyd*, because it "would be like saying that the Commission could apply the principle of gradualism in an electric case based on a customer's total utility bill, i.e., the amount a rate payer would pay for electric, gas, water and telecommunications services." *Id.* at 1021.

Six years after *Lloyd*, the General Assembly amended Section 1311(c) of the Code to exempt, upon petition, a public utility that provides both water and wastewater services from the requirement that the property used in furnishing the different services be segregated when setting base rates. 66 Pa.C.S. § 1311(c). In full, Section 1311(c) provides:

> When any public utility furnishes more than one of the different types of utility service, the [C]ommission shall segregate the property used and useful in furnishing each type of such service, and shall not consider the property of such public utility as a unit in determining the value of the rate base of such public utility for the purpose of fixing base rates. A utility that provides water and wastewater service shall be exempt from this subsection upon petition of a utility to combine water and wastewater revenue requirements. The [C]ommission, when setting base rates, after notice and an opportunity to be heard, may allocate a portion of the wastewater revenue requirement to the combined water and wastewater customer base if in the public interest.

13

*Id.* As explained by the Commission, Section 1311(c) authorizes a wastewater subsidy "to avoid steep rate hikes to wastewater customers" when wastewater utility providers undertake system improvement projects. (Commission's Br. at 27.) Nonetheless, this exception to the general principle is not automatic or required and is only permitted when it is in the public interest. 66 Pa.C.S. § 1311(c). Moreover, the Commission must still follow the principles delineated in *Lloyd* when allocating an Act 11 subsidy, especially that the cost of providing service is the polestar in ratemaking, because the General Assembly has not expressly disavowed *Lloyd's* dictates. *See Roverano v. John Crane, Inc.*, 226 A.3d 526, 538 (Pa. 2020) ("Under the Statutory Construction Act [of 1972, 1 Pa.C.S. §§ 1501-1991], 'an implication alone cannot be interpreted as abrogating existing law. The legislature must affirmatively repeal existing law or specifically preempt accepted common law for prior law to be disregarded.'") (citation omitted).

Here, the Commission violated the principles elucidated by *Lloyd* when it approved Aqua's methodology for allocating the water rate increase and the Act 11 wastewater subsidy. To start, the Commission erred by viewing the cost of providing service to Aqua Water customers inclusive of the Act 11 wastewater subsidy when setting water rates. The Commission claims that "for a utility providing both water and wastewater service, wastewater costs are not stand-alone, separate rates charged to water customers." (Commission's Br. at 24). However, water and wastewater services are separate utility services that require separate rates and can be provided by separate providers, as is the case here where the vast majority of Aqua's water customers get their wastewater service from a different utility provider. *See* Section 102 of the Code, 66 Pa.C.S. § 102 (listing water and wastewater as separate public utilities). Indeed, Section 1311(c) contemplates that

14

these services are separate as evidenced by the fact a utility must file a petition to be exempt from the requirement that its water and wastewater services be segregated when the Commission sets rates. *See* 66 Pa.C.S. § 1311(c). And while Section 1311(c) authorizes the Commission to combine water and wastewater revenue requirements by allocating a portion of a utility's wastewater revenue requirement to the utility's combined water and wastewater customer base when in the public interest, Act 11 does not transform this wastewater subsidy into a water cost. *See id.* Simply, the Act 11 wastewater subsidy is not a water revenue requirement, but a wastewater revenue requirement charged to water customers in addition to their own wastewater service costs. *See id.*

Moreover, when allocating a wastewater subsidy pursuant to Act 11, the Commission must still follow the principles dictated by *Lloyd*. The Commission did not do so here. Instead, the Commission usurped the cost of providing service as the primary ratemaking concern when it set water rates inclusive of the Act 11 wastewater subsidy because it "allow[ed] factors like gradualism, quality of service, and affordability of rates to come to the foreground." (*See* Commission's Br. at 29). As a further consequence, the Commission masked the actual cost of providing water service to Aqua Water customers. Significantly, the Commission also masked that over 91% of Aqua's approximately 450,000 water customers, who do not have Aqua wastewater service, will be paying two wastewater requirements: (1) the Act 11 wastewater subsidy approved in this case to Aqua and (2) their own wastewater service to a separate utility provider. Only the 8.5% of Aqua customers who receive both water and wastewater service from Aqua will not pay two wastewater revenue requirements to separate companies and will receive a benefit to their wastewater service from Aqua's wastewater infrastructure improvement projects. Therefore,

15

although from the perspective of Aqua Water customers the impact of the approved revenue increase includes both the water increase and the Act 11 wastewater subsidy, the Commission violated *Lloyd* because it allowed the principles of gradualism underlying Act 11 to trump the cost of providing water service as the primary ratemaking concern and masked the wastewater subsidy as a water cost for Aqua Water customers. *See* 904 A.2d at 1015, 1020-21.

Additionally, the method approved by the Commission for allocating the Act 11 wastewater subsidy violates established ratemaking principles. As explained above, while different customer classifications may be charged different rates, the rates for each classification must be primarily based on the cost of providing service for each specific classification. *Id.* at n.10, 1020. Because Aqua's different customer classifications vary substantially in their use of wastewater services, (*see* Supplemental Reproduced Record at 347a-50a),[8] reading Section 1311(c) of the Code to keep any wastewater subsidy tied to the cost of providing the wastewater service for each customer classification ensures compliance with established ratemaking principles. Thus, the Commission erred by allocating the Act 11 wastewater subsidy to Aqua's combined water and wastewater customer base regardless of the differences in wastewater usage among customer classifications.

---

[8] The pagination in the Supplemental Reproduced Record does not comply with Pennsylvania Rule of Appellate Procedure 2173, Pa.R.A.P. 2173 (requiring that "any supplemental reproduced record shall be numbered separately in Arabic figures and not in Roman numerals: thus 1, 2, 3 etc., . . . followed . . . by a small b, thus 1b, 2b, 3b, etc.").

16

## III. CONCLUSION

For the foregoing reasons, the Court vacates the October Order because the Commission erred as a matter of law in approving Aqua's methodology for allocating the water rate increase and the Act 11 wastewater subsidy. The Court therefore remands to the Commission for further proceedings consistent with the foregoing opinion.

_____
RENÉE COHN JUBELIRER, President Judge

Judge Fizzano Cannon did not participate in the decision in this matter.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NazAarah Sabree,                          :
Small Business Advocate,                  :
      Petitioner                :
                                :
      v.                        :   No. 1307 C.D. 2022
                                :
Pennsylvania Public                       :
Utility Commission,                       :
      Respondent                :

## **O R D E R**

NOW, November 17, 2025, the October 27, 2022 Order of the Pennsylvania Public Utility Commission is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
RENÉE COHN JUBELIRER, President Judge

NazAarah Sabree, : <br>
Small Business Advocate, : <br>
            Petitioner : <br>
: <br>
        v. : <br>
: <br>
Pennsylvania Public : <br>
Utility Commission, :   No. 1307 C.D. 2022 <br>
          Respondent :   Argued: April 9, 2025

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge <br>
               HONORABLE PATRICIA A. McCULLOUGH, Judge <br>
               HONORABLE ANNE E. COVEY, Judge <br>
               HONORABLE MICHAEL H. WOJCIK, Judge <br>
               HONORABLE LORI A. DUMAS, Judge <br>
               HONORABLE STACY WALLACE, Judge <br>
               HONORABLE MATTHEW S. WOLF, Judge

DISSENTING OPINION <br>
BY JUDGE COVEY                            FILED:  November 17, 2025

       Respectfully, I disagree with the Majority's conclusions and its reversal of the Pennsylvania Public Utility Commission's (Commission) October 27, 2022 decision (October 2022 Decision) denying reconsideration of the Commission's May 16, 2022 decision (May 2022 Decision) that *approved* Aqua Pennsylvania, Inc.'s (Aqua PA) and Aqua Pennsylvania Wastewater, Inc.'s (Aqua PA Wastewater) (collectively, Aqua) *request to allocate a portion of its wastewater revenue to its water customers pursuant to* Section 1311(c) of the Public Utility Code (Code), commonly referred to as Act 11.  Because Act 11 *expressly authorizes the Commission to "allocate a portion* of the wastewater revenue requirement to the combined water and

wastewater customer base *if in the public interest*[,]"[1] I would affirm the Commission's October 2022 Decision. 66 Pa.C.S. § 1311(c) (emphasis added).

Initially, this Court has acknowledged that "a utility has a constitutional and statutory right to a reasonable rate of return." *Emporium Water Co. v. Pa. Pub. Util. Comm'n*, 955 A.2d 456, 461 (Pa. Cmwlth. 2008). Section 1301 of the Code specifies that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable[.]" 66 Pa.C.S. § 1301. Because "there is no set formula for determining proper ratios among the rates of different customer classes[, w]hat is reasonable under the circumstances . . . is an administrative question for the [C]ommission to decide." *Peoples Nat. Gas Co. v. Pa. Pub. Util. Comm'n*, 409 A.2d 446, 456 (Pa. Cmwlth. 1979) (citation omitted); *see also McCloskey v. Pa. Pub. Util. Comm'n*, 225 A.3d 192, 202-03 (Pa. Cmwlth. 2020) (quoting *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997) (*Popowsky II*)) (Rate making decisions "involv[ing] complex financial determinations and weighing and interpreting statistical and economic evidence . . . [are] within the [Commission's] area of expertise."). Therefore, this Court has held that "[t]he [Commission] has broad discretion in determining whether rates are reasonable" and "is vested with discretion to decide what factors it will consider in setting or evaluating a utility's rates." *Popowsky v. Pa. Pub. Util. Comm'n*, 683 A.2d 958, 961 (Pa. Cmwlth. 1996) (*Popowsky I*).

Because, "using its expertise," the Commission "determine[s] which [rate structure] method is most accurate given the particular circumstances of the case and economic climate[,]" "such decisions are left entirely up to the discretion of the Commission" "[a]s long as there is a rational basis for [its] methodology[.]" *McCloskey*, 225 A.3d at 203 (quoting *Popowsky II*, 706 A.2d at 1201). Thus, "[t]his

---

[1] Aqua's proposal would result in an allocation of approximately 30% of Aqua's proposed revenue requirement from wastewater to water. *See* Office of Small Business Advocate's Br. App. B, May 16, 2022 Dec., at 192; *see also* Reproduced Record at 423a-424a.

[C]ourt's scope of review is limited." *Peoples Nat. Gas Co.*, 409 A.2d at 456. "It is not this Court's role to choose between the conflicting [rate setting] approaches . . . . [Rather, *this Court's*] *appellate role is limited and one of deference* to the [Commission]" *when the record supports the Commission's conclusions*. *Emporium Water Co.*, 955 A.2d at 464 n.15 (emphasis added).

Against this well-established legal backdrop, the issue before this Court is whether the record supports the Commission's determination that Aqua's methodology to allocate a portion of its wastewater revenue to its water customers was in the public interest and more reasonable than the Office of Small Business Advocate's (OSBA) methodology. The Administrative Law Judge (ALJ) observed: "OSBA agrees with [Aqua's] method of allocating the Act 11 revenue requirement to its water customers on a revenue neutral basis by customer class, but opposes the magnitude of Act 11 subsidy." ALJ's 2/18/2022 Recommended Decision (R.D.) at 85; *see also* May 2022 Dec. at 214.

NazAarah Sabree, on behalf of the OSBA, challenged Aqua's proposed water revenue allocation on the basis that it failed to move all customers closer to their respective cost-based revenue levels and advocated for a methodology that allocated Act 11 revenues on a revenue-neutral basis across customer classes. During six public hearings, "[t]he ALJ considered multiple water revenue allocations proposed by the parties . . . , including those proposed by OSBA[,]" Comm'n Br. at 7, specifically "compared Aqua's proposed water revenue allocation with [] OSBA's recommended allocation[,] and concluded . . . '[Aqua]'s methodology better reflect[ed] the cost of service.'" May 2022 Dec. at 203 (quoting R.D. at 92); *see also id*. at 228-229. After the Commission reviewed the extensive record, it adopted the ALJ's Recommended Decision.

In its exceptions to the ALJ's Recommended Decision, OSBA argued that the Commission's decision violates *Lloyd v. Pennsylvania Public Utility Commission*,

904 A.2d 1010 (Pa. Cmwlth. 2006), and is not in the public interest as Act 11 requires.

In denying OSBA's exceptions, the Commission explained in its May 2022 Decision:

> [The Commission] [is] of the opinion that reasons considered by the ALJ upon which she based her recommendation to approve [Aqua's] allocations of revenues between all water and wastewater customer classifications are just, reasonable, and in the public interest, and should be approved.   []   OSBA's contention is that Aqua's proposed revenue allocation, which views cost of service as a whole and does not exclude the Act 11 allocation, conflicts with the requirement in *Lloyd* that the basis for individual utility service rates is specific to each service's cost of service. [The Commission] find[s] this argument unpersuasive.  As noted by Aqua . . . , [] OSBA's reliance upon *Lloyd* appears to be misplaced as wastewater costs are not stand-alone, separate rates charged to water customers.   Therefore, [**the Commission**] do[es] **not believe that the principles of *Lloyd* have been violated**.  [] OSBA also argues that its proposed water revenue allocation correctly isolates the Act 11 allocation.  [The Commission] disagree[s].  Rather, [**the Commission**] **find[s] the ALJ's conclusion**, **that [Aqua's] methodology better reflects the cost of service because Aqua's proposed allocation views cost of service "as a whole" and moves each customer classification toward its appropriate cost of service**, **is more persuasive and in the best interest of the public**.  R.D. at 92.

May 2022 Dec. at 228-229 (emphasis added).

In its October 2022 Decision denying reconsideration of its May 2022 Decision, wherein OSBA raised the same argument, the Commission reiterated:

> [R]egarding [] OSBA's claim that the May 2022 [Decision] failed to apply the holding in *Lloyd*, [the Commission] agree[s] that, as argued by Aqua, the Commission's May 2022 [Decision] expressly considered and rejected [] OSBA's arguments regarding the application of *Lloyd* in the present case to Aqua's water revenue allocation.  Further, **the May 2022 [Decision's] treatment of Act 11 wastewater revenues violates neither the plain language of Section 1311 of the Code nor the holding in *Lloyd***.

AEC - 4

> It is evident upon review of the Commission's May 2022 [Decision] and the ALJ's Recommended Decision which it adopted, both the Commission and the ALJ expressly considered and applied *Lloyd* in their adoption of a proposed revenue allocation. It is also clear that **both the Commission and the ALJ declined to adopt [] OSBA's interpretation of *Lloyd***.

October 2022 Dec. at 21 (emphasis added).

Once again, on appeal, OSBA argues that the Commission should have accepted its proposed methodology. However, it is for the Commission - based on its expertise and its weighing of all the evidence before it - not this Court, to decide what is in the public's interest. *See Popowsky I*, 683 A.2d 958; *see also Peoples Nat. Gas Co.* After reviewing the proposed methodologies, the Commission determined that Aqua's proposed methodology was the most reasonable and in the public interest, as it was permitted to do based on the evidence. Notwithstanding, the Majority concludes, after supplying *its* own analysis of the record evidence, that "when allocating a wastewater subsidy pursuant to Act 11, the Commission must still follow the principles dictated by *Lloyd*[,]" *Sabree v. Pa. Pub. Util. Comm'n*, ___ A.3d ___ (Pa. Cmwlth. No. 1307 C.D. 2022, filed Nov. 17, 2025), slip op. at 15, and, thus, "erred by allocating the Act 11 wastewater subsidy to Aqua's combined water and wastewater customer base regardless of the differences in wastewater usage among customer classifications." *Id*. at 16.

However, as the Majority recognized, *see id*. at 12 n.7, the *Lloyd* decision is distinguishable from the instant matter *because Lloyd* involved a discrimination claim under Section 1304 of the Code, 66 Pa.C.S. § 1304,[2] in the context of the

---

[2] Section 1304 of the Code specifies, in pertinent part:

> No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public

Electricity Generation Customer Choice and Competition Act,[3] neither of which apply here.

Even if *Lloyd* did govern this matter, the *Lloyd* Court declared that the polestar concern is cost of service in rate making cases; it did not declare that cost of service was the *exclusive* determining factor, as gradualism, quality of service, and affordability also apply. Further, despite the *Lloyd* Court's concern over the potential masking of a utility's service rates, six years *after* this Court decided *Lloyd*, the General Assembly enacted Act 11 which states, in relevant part: "**The [C]ommission**, when setting base rates, after notice and an opportunity to be heard, **may allocate a portion of the wastewater revenue requirement to the combined water and wastewater customer base if in the public interest**." 66 Pa.C.S. § 1311(c) (emphasis added). The Majority claims that *Lloyd* still controls Act 11 cases because "the General Assembly has not expressly disavowed *Lloyd's* dictates." *Sabree*, ___ A.3d at ___, slip op. at 14. However, because Act 11 did not apply to *Lloyd's* facts, the General Assembly had no reason to disavow its dictates. Thus, Act 11 expressly allows the Commission to approve Aqua's proposal - to separate at least some of the wastewater service costs

---

utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. Unless specifically authorized by the [C]ommission, no public utility shall make, demand, or receive any greater rate in the aggregate for . . . property of the same class . . . . This section does not prohibit the establishment of reasonable . . . classifications of rates . . . .

66 Pa.C.S. § 1304. Accordingly,

[d]ifferent rates may be charged to customers that receive a different type, grade[,] or class of service. However, if the total sum demanded of one customer is illegally high and illegally low for another, there is rate discrimination. Rate classification systems must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers.

*Phila. Suburban Water Co. v. Pa. Pub. Util. Comm'n*, 808 A.2d 1044, 1059-60 (Pa. Cmwlth. 2002) (citations omitted).

[3] 66 Pa.C.S. §§ 2801-2815.

AEC - 6

from its wastewater customers and place them on its water service customers, if doing so is in the public interest.

Ultimately, the parties and the Majority agree that Aqua is entitled to revenue to improve its infrastructure. The law expressly allows Aqua to pass a portion of its costs on to its water and wastewater customers. The Commission accepted and extensively reviewed evidence on both Aqua's and OSBA's proposed methodologies and calculations, public statements, and testimony and challenges thereto - notably observing that OSBA neither challenged Aqua's cost of service studies nor Aqua's methodology - and concluded that Aqua's methodology was more reasonable and in the public's interest. Because there was a rational basis for the Commission's decision, this Court may not substitute its judgment for that of the Commission. Nevertheless, the Majority usurps the Commission's function, conducts its own fact-finding, reaches a different conclusion, and remands for the Commission to change a decision only the Commission had the discretion to make.

Based on the foregoing, I would affirm the Commission's October 2022 Decision.

_____
ANNE E. COVEY, Judge